674 P.2d 1029

**STATE of Idaho, Plaintiff-Respondent,**

v.

**Richard A. RODRIQUEZ,
Defendant-Appellant.**

No. 13821.

Court of Appeals of Idaho.

Dec. 20, 1983.

John C. Lynn of Lynn, Scott & Hackney, Boise, for defendant-appellant.

David H. Leroy, Atty. Gen., Lynn E. Thomas, Sol. Gen., Boise, for plaintiff-respondent.

SWANSTROM, Judge.

Richard Rodriquez has appealed from his judgment of conviction for second degree murder. His appeal raises several issues: (1) Did the trial court err in denying a motion for mistrial made by Rodriquez after the court refused to strike the testimony of a witness? (2) Did the court err in admitting the testimony of a detective offered in rebuttal to show that Rodriquez was not remorseful immediately after the killing? (3) Did the court err in denying

Rodriquez' motion for a judgment of acquittal? And, (4) did the court err in refusing to grant a new trial after a juror submitted an affidavit stating that other jurors had pressured her into reaching a guilty verdict? We find that no prejudicial error occurred at Rodriquez' trial and that his conviction is supported by substantial, competent evidence. We thus affirm the conviction.

On December 30, 1979, Richard Rodriquez and George Wemm spent the afternoon together drinking beer. They went from bar to bar ending up at a tavern in Meridian, Idaho, known as the Hanging Tree.

Rodriquez testified that he and Wemm were brothers-in-law and usually got along well together. That night, at the Hanging Tree, they were talking, drinking and apparently having a good time until Rodriquez noticed his wife (Wemm's sister) seated at the bar. According to Rodriquez, his wife's presence at the bar angered him. He feared that a "bull decker" (a lesbian) was trying to "pick her up." Rodriquez approached his wife and demanded that she leave, but she refused and did her best to ignore him. Trying to get her attention, Rodriquez hit her in the back and started pulling her hair. One of the bartenders intervened to protect her, but soon Rodriquez and Wemm began fighting each other.

Their brief scuffle ended when two bartenders separated them. The bartenders told both men that they had to leave, and one of them escorted Wemm out the side door. Rodriquez remained in the bar for several more minutes. During this time he took off both his shirts—a sweatshirt and a T-shirt—but he put the sweatshirt back on. As he left the bar escorted by one of the bartenders, he was carrying his T-shirt wrapped around his right hand. When Rodriquez and the bartender went out the front door, they found Wemm, who was in a dazed condition, leaning against the wall of the building. Someone yelled an obscenity and Rodriquez lunged at Wemm, making a roundhouse swing with his right arm and striking Wemm in the chest. The bartender again intervened to break up what he

thought was another fist fight. He told Rodriquez to leave, ushered him off the bar's property, and returned to find that Wemm had suffered a puncture wound in the chest. A few minutes later the police arrived, and Rodriquez returned to the bar and was arrested. The police discovered an open folding knife in a field across from the bar. Wemm later died as a result of a punctured heart.

At trial several witnesses testified concerning Rodriquez' behavior in the bar. All who testified said that Rodriquez was not drunk. No witnesses actually saw Rodriquez carrying a knife prior to the stabbing. The bartender who escorted Rodriquez out of the tavern was an eyewitness to the stabbing, but he too admitted that at no time did he actually see Rodriquez with a knife. Taking the stand in his own defense, Rodriquez admitted that the weapon found by the police belonged to him and that he had stabbed Wemm. He claimed, however, that he did not open the knife until after he got outside and that Wemm, who also carried a knife, had threatened to "stick" him. The police found Wemm's knife still in its sheath on his belt.

## I

One of the state's witnesses was Lola Layne, the proprietor of the Hanging Tree. Layne testified that she arrived at the bar at the same time as the police and saw Rodriquez wandering about. She also related a brief conversation she then had with Rodriquez:

Q. What did you say to Mr. Rodriquez and what did he say to you.

A. He said, "Hello, Lola, what's going on? What's happened?" I replied by saying, "I'm quite sure you know what's happened. I've had trouble with you before."

Rodriquez' attorney later moved to strike this portion of Layne's testimony on the ground that the state had failed to disclose this statement in responding to a discovery request. Counsel also pointed out that the statement tended to characterize Rodriquez as a troublemaker. The court denied Rodri-

quez' motion to strike and his subsequent motion for mistrial. Rodriquez renews his contentions on appeal. He argues that the failure to disclose the statement was prejudicial because the prosecution introduced it "out of the blue" at trial. Moreover, he argues that the statement was improper character evidence and that the witness' characterization of him as a troublemaker was highly prejudicial to his defense. He thus contends that the trial court abused its discretion in failing to grant a mistrial.

Prior to and at the time of trial in this case, the old "Rules of Criminal Practice and Procedure" were in effect. Rule 16(a)(1) required disclosure of certain evidence and materials by the prosecution upon motion of a defendant. The prosecution was required to disclose "any relevant, oral statement made by the defendant whether before or after arrest to a peace officer, prosecuting attorney or his agent."

In response to Rodriquez' request for disclosure of "written, recorded and oral statements made by the defendant," the prosecution replied that the only statements that had been made by the defendant were oral, "as generally testified to at the preliminary hearing." Lola Layne did not testify at the preliminary hearing. Rodriquez thus argues that the prosecution's response to his discovery request was in bad faith since it led him to believe that any statements that might be introduced against him at trial had been revealed at the preliminary hearing. He contends that he was caught off guard when the prosecution offered Layne's testimony.

█ The trial court ruled that the state did not violate former rule 16(a)(1) by failing to disclose Rodriquez' oral statement to Layne since Layne was not "a peace officer, prosecuting attorney or his agent." We agree with this ruling. Rodriquez' statement to Layne did not fall within the ambit of former rule 16(a)(1), and the prosecution was not required to disclose it before trial. The state was required to, and did, furnish defendant's counsel with the name of Lola Layne as a potential state's witness. But,

the former rule specifically did not require the state to disclose any statements made by Lola Layne to "agents of the prosecuting attorney or to any official involved in the investigatory process of the case." (Rule 16(a)(2)(ii).)

Relying on *State v. Wrenn*, 99 Idaho 506, 584 P.2d 1231 (1978), Rodriquez also contends that the court should have excluded Layne's testimony as improper character evidence. In *Wrenn* the state prosecuted two defendants for armed robbery. A police officer testified that at the time of the alleged robbery, the defendants were traveling in a stolen car. The court held that this evidence of unrelated criminal activity by the defendants should not have been admitted and it reversed the convictions. The court noted that evidence of a defendant's past criminal activity is only allowed to come before the jury in certain specific circumstances.

█ The decision in *Wrenn* does not apply directly to the case before us. The questionable testimony here did not concern prior criminal activity of the defendant. It is apparent, however, that the jury could have inferred from Layne's testimony that Rodriquez was a troublemaker, a bad character. It is a general rule that evidence of a defendant's bad character offered merely to show his propensity toward criminal activity is not admissible. Most often this rule comes into play, as in *Wrenn*, to preclude evidence concerning prior criminal acts. It is also applicable, however, to exclude any evidence of a defendant's bad character "unless and until the accused gives evidence of his good character . . . ." McCORMICK, HANDBOOK OF THE LAW OF EVIDENCE §§ 188–90 at 444–47 (2d ed. 1972).

Rule 29.1(a) of the former Rules of Criminal Practice and Procedure, which is virtually identical to present I.C.R. 29.1(a), provided in part:

At any time during trial, the court may declare a mistrial and order a new trial of the indictment, information or complaint under the following circumstances:

(a) Upon motion of the defendant, when there occurs during the trial an error or legal defect in the proceedings, or conduct inside or outside the courtroom, which is prejudicial to the defendant and deprives him of a fair trial.

In *State v. Urquhart*, 105 Idaho 92, 95, 665 P.2d 1102, 1105 (Ct.App.1983) we expressed the standard for review of denial of a criminal defendant's motion for mistrial:

[T]he question on appeal is not whether the trial judge reasonably exercised his discretion in light of circumstances existing when the mistrial motion was made. Rather, the question must be whether the event which precipitated the motion for mistrial represented reversible error when viewed in the context of the full record. Thus, where a motion for mistrial has been denied in a criminal case, the "abuse of discretion" standard is a misnomer. The standard, more accurately stated is one of reversible error. Our focus is upon the continuing impact on the trial of the incident that triggered the mistrial motion. The trial judge's refusal to declare a mistrial will be disturbed only if that incident, viewed retrospectively, constituted reversible error.

█ An appellant has the burden to show prejudicial error, and absent such a showing, error will be deemed harmless. *State v. Ellis*, 99 Idaho 606, 586 P.2d 1050 (1978). The erroneous admission of evidence does not in every case require reversal. Such error will be deemed harmless if an appellate court finds, beyond a reasonable doubt, that there was no reasonable possibility that the erroneously admitted evidence contributed to the conviction. *State v. Sharp*, 101 Idaho 498, 507, 616 P.2d 1034, 1043 (1980).

█ While not wishing to depreciate the importance of the rule excluding evidence of bad character to show criminal propensity, we do not consider Layne's statement in this case, even if improperly admitted, momentous enough to warrant reversal. The evidence against Rodriquez was strong. An eyewitness observed Rodriquez inflict the mortal blow. When testifying in his own

behalf, Rodriquez admitted that he stabbed Wemm and admitted ownership of the murder weapon. Two witnesses testified that Rodriquez had his T-shirt wrapped around his right hand—the hand that inflicted the wound—before he went out the front door of the bar. Given that the stabbing occurred almost immediately after Rodriquez stepped outside, the jury could infer from the evidence that Rodriquez had his weapon ready, and was attempting to conceal it, before he left the bar. The weight of this evidence negates any doubt that Layne's remarks, though erroneously admitted, could have had any influence upon the jury's verdict. While the admission of Layne's testimony may have been prejudicial toward Rodriquez, its prejudicial effect, taken in the context of the entire trial, was only slight, and hence the admission of her testimony was not reversible error. The admission of Layne's statement did not deprive Rodriquez of a fair trial. Thus, we hold that the trial court did not commit reversible error in denying Rodriquez' motion for mistrial.

## II

Rodriquez next contends that the court erred in admitting the testimony of a detective, Gary Carr, offered in rebuttal to show that Rodriquez exhibited little emotion or grief after the killing. While on the stand in his own defense, Rodriquez testified that he and the victim had been very close friends and that he was very sorry about what he had done. Rodriquez' testimony was interrupted several times by crying and sobbing and left the impression that his remorse was genuine. To neutralize this impression, the state in rebuttal presented the testimony of Detective Carr.

The court admitted the following testimony over Rodriquez' objection:

Q. Lieutenant Carr, were your present at the Ada County Sheriff's Office at the same time the defendant was later that same evening?

A. Yes, sir, I was.

Q. Okay. Physically, where were you in relation to the defendant?

A. I was in the same room with him.

Q. Who else was present?

A. Myself and Detective Cortez and the defendant.

Q. Were all of you talking together?

A. Yes, sir, we were.

Q. During the course of this conversation, did you advise Mr. Rodriquez that George Wemm had died?

A. Yes, I did.

Q. What was his reaction?

A. Actually, when I advised him of it, it was rather a smug reaction as "so what."

Q. Did he exhibit any grief during this time period after you had advised him of that?

A. No, sir, he did not.

Q. Did he cry at any time?

A. No, sir, he did not.

Rodriquez argues first that Carr's testimony was improper rebuttal because whether Rodriquez did or did not exhibit any grief in the hours following the killing had nothing to do with the remorse he may have felt at the time of trial. In addition, he contends that there was an inadequate foundation for Carr's testimony because it was not shown clearly that at the time of the interrogation Rodriquez actually knew of Wemm's death. We believe that Carr's statement to Rodriquez, informing him that Wemm had died, established a sufficient foundation for Carr's testimony. Moreover, Carr's testimony that Rodriquez displayed no grief upon hearing of Wemm's death was relevant to rebut Rodriquez' testimony that he and Wemm had been extremely close friends, almost like brothers.

As our Supreme Court has noted, rebuttal evidence is evidence which explains, repels, counteracts or disproves evidence which has been introduced by or on behalf of an adverse party. *State v. Olsen,* 103 Idaho 278, 647 P.2d 734 (1982). Carr's testimony certainly fits within this description. A trial court has broad discretion in admitting rebuttal evidence, and, absent a clear abuse of discretion, its ruling admitting such evidence will be sustained on appeal. *State v. Olsen, supra.* We hold that

the court did not abuse its discretion in admitting Carr's testimony as rebuttal evidence.

■ Rodriquez also argues that Carr's testimony was improper opinion evidence. However, Carr was not asked by the prosecutor to express an opinion concerning Rodriquez' state of mind. Rather he was asked whether Rodriquez had exhibited any grief and whether he had cried. These questions were not intended to, and did not, elicit an opinion about Rodriquez' subjective mental or emotional condition. They called for the witness to testify about objective facts: whether Rodriquez had displayed grief or whether he had cried. Carr was competent to testify about the physical appearance and behavior of Rodriquez during the interview. We are not persuaded that any error has been shown here.

### III

Rodriquez' third contention is that the trial court erred in denying his motion for a judgment of acquittal. Rule 29(a) of the former Rules of Criminal Practice and Procedure provided in part:

The court on motion of the defendant or on its own motion shall order the entry of judgment of acquittal of one or more offenses charged in the indictment, information or complaint after the evidence on either side is closed if the evidence is insufficient to sustain a conviction of such offense or offenses.

In *State v. Huggins,* 103 Idaho 422, 427, 648 P.2d 1135, 1140 (Ct.App.1982), *aff'd as modified,* 105 Idaho 43, 665 P.2d 1053 (1983), this court set forth the test for deciding a motion for judgment of acquittal:

The trial judge must review the evidence in the light most favorable to the state, recognizing that full consideration must be given to the right of the jury to determine the credibility of witnesses, the weight to be afforded evidence, as well as the right to draw all justifiable inferences from the evidence. [Citations omitted.] Viewed in this manner, where the inculpatory evidence presented as to any essential element of the crime is so insub-

stantial that jurors could not help but have a reasonable doubt as to the proof of that element, a judgment of acquittal should be entered.

Rodriquez contends the evidence against him was insufficient to sustain the verdict because the state did not establish that he killed Wemm with "malice aforethought." Rodriquez argues that the lack of a sufficient showing of malice precludes his conviction for second degree murder and that the evidence supports only a conviction for voluntary manslaughter.

Rodriquez marshalls the following "facts" to support this argument: (1) he and Wemm were good friends and had been getting along well all evening prior to the stabbing; (2) both he and Wemm were very drunk; (3) the killing occurred while Rodriquez was in a jealous rage after a quarrel he had had with his wife in which Wemm had become involved; and (4) Wemm was armed with a buck knife and made a profane threat to Rodriquez just before the stabbing. Rodriquez also suggests that malice cannot be implied from his use of a knife against Wemm because he did not use it in a way that indicated an intent to kill.

Idaho Code § 18–4001 defines murder as "the unlawful killing of a human being with malice aforethought ...." Section 18–4002 states:

Such malice may be express or implied. It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature. It is implied when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart.

■ Our Supreme Court has held on several occasions that where a defendant uses a deadly weapon against the person of another in a deadly and dangerous manner, the element of malice may be presumed. *State v. Warden,* 100 Idaho 21, 592 P.2d 836 (1979); *State v. Gomez,* 94 Idaho 323, 487 P.2d 686 (1971); *State v. Snowden,* 79 Idaho 266, 313 P.2d 706 (1957). Such a presumption may be rebutted. *State v. Anstine,* 91

Idaho 169, 173, 418 P.2d 210, 214 (1966). Ultimately, it is "the province of the jury to determine whether the evidence in the record only supports a conviction of voluntary manslaughter . . . or, on the other hand, whether there is sufficient proof of malice, to justify a conviction of either first or second degree murder." *State v. Gomez,* 94 Idaho at 325, 487 P.2d at 688. Here, there was competent and substantial, though conflicting evidence to sustain a jury's "finding" of malice.

From such evidence it reasonably could be inferred that Rodriquez did not act upon provocation or in the heat of passion. When Rodriquez left the bar he had his T-shirt wrapped around his right hand. Because Rodriquez struck the fatal blow with his right hand just after he stepped out of the tavern, this evidence gives rise to an inference that while Rodriquez was still in the bar he had already armed himself and was planning, or at least preparing for, a violent confrontation. Moreover, after his scuffle with Wemm, Rodriquez remained in the bar for several minutes before one of the bartenders escorted him outside. Rodriquez did not draw his weapon during the scuffle in the bar; he drew it only after the scuffle was over. In addition, the bartender who witnessed the slaying did not recall that Wemm had threatened Rodriquez prior to the stabbing. He remembered that someone had uttered a profanity, but he did not recall who had said what to whom. Finally, the fact that Wemm left the bar in a dazed condition and that he was standing slumped against the wall of the building just prior to the attack does not support Rodriquez' claim that Wemm presented a threat to him. It should also be noted that numerous witnesses testified that Rodriquez did not appear intoxicated during the time they observed him prior to the stabbing.

Viewing these facts in the light most favorable to the state, the evidence of the crucial element of intent is not so insubstantial that the jurors could not help but have a reasonable doubt as to proof of that element. To the contrary, the evidence, and the inferences which can reasonably be drawn from it, strongly support the conclusion that Rodriquez acted with malice. Accordingly, we hold that the court did not err in denying Rodriquez' motion for a judgment of acquittal.

IV

Rodriquez contends finally that the court should have granted a new trial based upon an affidavit by a juror, submitted to the court by Rodriquez' counsel after the trial was over. In the affidavit the juror claimed that she had been "pressured" by other jurors into reaching a guilty verdict and that at the time she assented to the verdict she did not believe that the defendant was guilty of a crime greater than manslaughter. The juror's doubts came to light a few days after the trial when she wrote a letter to the presiding judge.

 It has long been the rule in this state that a jury's verdict cannot be impeached by affidavit or otherwise except where the verdict was determined by chance. *State v. Scroggins,* 91 Idaho 847, 848, 433 P.2d 117, 118 (1967). Although due process considerations might justify exceptions to this rule in some circumstances, we do not believe such circumstances are present here. *See* ABA STANDARDS, TRIAL BY JURY § 5.7 (1968). Several courts from neighboring jurisdictions have specifically concluded that a juror's affidavit that he or she was pressured by other jurors into assenting to a verdict is not grounds for a new trial. In *Gafford v. State,* 440 P.2d 405, 418–19 (Alaska 1968), *cert. denied* 393 U.S. 1120, 89 S.Ct. 996, 22 L.Ed.2d 125 (1969), the Alaska Supreme Court rejected the contention that a trial court had erred in denying a motion for a new trial based on a juror's affidavit that the verdict "was not her true and considered verdict but was the result of exhaustion and intimidation through remarks of other jurors and through sympathy for the physical welfare of other jurors." In *State v. Melcher,* 15 Ariz.App. 157, 487 P.2d 3, 7 (1971), an Arizona Appellate Court held that the trial court abused its discretion in

granting a new trial after a juror submitted an affidavit that "she was pressured into going along with a unanimous verdict of 'guilt' by the sheer weight of the other jurors ...." Finally, *State v. Hoff,* 31 Wash.App. 809, 644 P.2d 763, 766 (1982) held that the trial court erred in granting a new trial after a juror submitted an affidavit that she was sick with a cold during deliberations and that other jurors exerted pressure on her to vote to convict the defendant. We agree with these decisions. Accordingly, we hold that the trial court did not err in denying Rodriquez' motion for a new trial.

We affirm the judgment of conviction.

WALTERS, C.J., and BURNETT, J., concur.